OPINION OF THE COURT
Peter Tom, J.
This summary holdover proceeding is brought by the New York County District Attorney’s office under a new program created by the prosecutor’s office and other governmental agencies designed to evict drug dealers from residential and other real property used for illegal drug trade, business or manufacture pursuant to RPAPL 715.
This eviction program is the progeny of the explosion of drug-related crimes which have overwhelmed the City of New York and have sent a wave of fear throughout the communities of our city. The District Attorney’s office has realized that many of the drug dealers are conducting their insidious trade directly from residential premises, with impunity, since many local residents and neighbors are in fear for their safety and lives to report such illegal activities to the authorities. The prosecutor’s office and other city agencies realized the need for intervention.
RPAPL 715 in relevant part provides that any domestic *1053 corporation organized for the suppression of vice or any duly authorized enforcement agency of the State or of a subdivision thereof, under a duty to enforce the provisions of the Penal Law or any State or local law, ordinance, code, rule or regulation relating to buildings, may commence a summary eviction proceeding against a tenant who uses the demised real property in whole or in part for any illegal trade, business or manufacture as if the enforcement agency is the owner of the property, if the owner has failed to do so after five days’ written notice.
The premises in focus in this case is a four-bedroom apartment located at 170 Madison Street which is situated in the lower east side of Manhattan. The subject building is part of the public housing complex known as the Rutgers Houses owned by the New York City Housing Authority.
There have been numerous complaints filed by other tenants with the City Housing Authority Police regarding illegal drug activities being conducted from apartment 17H of the subject building for a period of over IV2 years. The Housing Authority Police have kept a surveillance of the apartment during that period of time.
On June 30, 1988, at approximately 9:45 p.m., New York City Housing Authority Police Officers William Doheny and Michael Keating of the narcotics squad received a radio call directing them to proceed to the subject apartment to investigate illegal drug sales in progress. The officers drove to 170 Madison Street and Officer Doheny proceeded up to apartment 17H while Officer Keating stayed outside of the building. While Officer Doheny watched the door of apartment 17H from the stairwell area through a crack between the door he saw a youth leaving the apartment in issue with a number of glassine envelopes in his hands. Officer Doheny arrested the youth and then knocked on the door of apartment 17H. When he announced his presence he heard a great deal of commotion in the apartment. Officer Doheny heard someone in the apartment yell the word "botando” but he did not know the meaning of the word and thought it meant police. The court later ascertained that the meaning of the word "botando” is throwing or flinging out in Spanish. Officer Doheny then radioed Officer Keating and told him to watch the windows of apartment 17H. Officer Keating proceeded to the westerly side of the front of the building where the apartment in issue is located. He looked up at the top of the building and counted three floors down and watched. Within minutes he saw objects *1054 cascading out of a window of apartment 17H. He retrieved the objects which included a loaded .38 caliber revolver, 21 glassine envelopes and a small bag containing white substance which appears to be heroin.
Office Doheny called for backup and returned to the apartment and arrested respondent Estella Rodriguez and seven other individuals. The apartment was secured while the officers obtained a search warrant.
As the backup police team arrived the area surrounding the building was cornered off. At approximately 10:45 p.m., Sergeant Laura Schecter of the Housing Authority Police and two other officers searched the grounds located by the side and the back of the building where windows of apartment 17H also overlook. Officer Keating was only able to observe the windows of apartment 17H located in front of the building and not the windows of the subject apartment located on the side and rear of the building. Sergeant Schecter testified that she found in the grassy area in the back of the building beneath apartment 17H many small broken blocks or cakes of white substance. The broken pieces of white substance appear to be originally in disc shape approximately five inches in diameter and one-quarter to one-half inches in thickness wrapped in cellophane. There were traces of white powder scattered all around the broken pieces of white substance which appears to have fallen from a great height. A scale and a small calculator were also found in the area.
At 6:30 a.m. the police officers executed the warrant and searched the apartment. Officer Keating testified that the officers found in the apartment items including an electronic currency counting machine; two triple-beam scales; a bulletproof vest; a large volume of United States currency in different denominations; a pellet and 12-gauge flare gun; 10 .38 caliber rounds of ammunition; a pocketbook containing identifications of respondent Rodriguez with a secret pocket sewn on the bottom which contained United States currency; numerous passports, voter’s registration and alien registration cards; two walkie talkies; and 20 to 30 pairs of new Nike sneakers.
All the white substance retrieved by the police officers was vouchered and sent to the police laboratory for analysis.
The police laboratory reports showed that the 10 glassine envelopes found with the youth arrested outside of apartment 17H contained 5.2 grains of heroin; the 21 glassine envelopes *1055 and a bag seen thrown out of a window of apartment 17H contained three eighths of an ounce and 8.8 grains of heroin; and the cakes of white substance found by Sergeant Schecter in the grassy area beneath apartment 17H contained 1 pound, 15 V2 ounces and 8.5 grains of heroin.
The chemist, Anthony Veneziano, testified that the heroin he tested (samples from the 1 pound, 15 lá ounces and 8.5 grains) was between 84% to 85% pure heroin which is considered to be a very high concentration of purity for heroin.
Based on the testimony of Officer Doheny, the street value of the heroin found in this case is in excess of $1 million. This is in consideration of the purity and large volume of the heroin, and the cutting of the drug for street sales.
The total amount of United States currency found in the apartment was in the sum of $22,983.
The tenant of record of apartment 17H is respondent Estella Rodriguez who resides in the apartment with her four children ranging in ages of 15 to 21 years old. Her 1987 income affidavit filed with the New York City Housing Authority shows that none of the household members are employed. Respondent Rodriguez is a welfare recipient and her monthly income as set forth in the affidavit consists of $454 from the Department of Social Services and $317 from Social Security benefits. Her 1987 anticipated gross annual income for the entire family was $10,151.
Respondent tenants contend that petitioner has failed to present any evidence of illegal drug activity conducted in the premises since there was no evidence offered by petitioner to show that any of the respondent tenants engaged in a sales transaction of a controlled substance nor did the police find any controlled substance in the premises.
The burden of proof under RPAPL 715 does not require proof of the commission of the specific illegal acts but it is sufficient that the acts and conduct complained of warrant an inference of the illegal purposes for which the premises are being used. (City of New York v Goldman, 78 Misc 2d 693; Matter of Kellner v Cappellini, 135 Misc 2d 759; also see, RPAPL 715 [1].)
The different accoutrements and items found in this apartment would lead the court to infer that the apartment in issue was being used by respondent tenants for an illegal activity which appears to be lucrative and dangerous. This inference can be drawn from the large volume of cash, an electronic *1056 dollar bill counting machine, guns and ammunition, and a bullet-proof vest found in the premises.
The evidence in this case showed that respondent tenants had much more income than what was disclosed in the income affidavit of respondent Rodriguez. Respondent tenants failed to offer any credible evidence to show how a family of six with no apparent means of support other than the limited benefits from welfare and Social Security can legally accumulate such a large sum of cash and assets.
Officer Doheny testified that on March 30, 1987 he stopped respondent Rodriguez’s 21-year-old son, Felix Pichardo, who was driving a brand new 1987 red Pontiac Firebird with a police scanner. Felix Pichardo had in his possession $1,887 in cash and many pairs of new sneakers in the back of the vehicle which he stated were for "his boys”. The car was registered in the name of respondent Estella Rodriguez. Respondent Rodriguez also made different trips to Santa Domingo, in the past few years, as evidenced by her passport, and on one of the trips she deposited with a bank $2,600 in an interest-bearing account. There was also a new motor scooter found in the apartment.
Officer Doheny testified that drug dealers employ youngsters known as "runners” who would supply illegal drugs to the street dealers, and that the constant deliveries made by the runners on foot require a continuous new supply of sneakers.
The court did not find the testimony of respondent Rodriguez’s 19-year-old daughter, Marisel Pichardo, that part of the $22,983 found in the apartment was her savings, credible. Ms. Pichardo who presently attends college and resides in Florida testified that $16,000 of the cash found in the apartment was money she and her parents saved throughout the years for her tuition. The court finds it unbelievable that a 19 year old who is a full-time student in college and charged with paying her own tuition and living expenses can save $16,000 from part-time employment. Her present monthly expenses include $325 for rent and approximately $150 for food. She testified that she never opened a bank account in New York City to deposit her savings but kept it all in cash in the apartment throughout the years.
The linchpin between the different accoutrements and incriminating evidence found in the apartment, and the type of illegal activity conducted by respondent tenants in the premises is the large amount of heroin found in this case.
*1057 Officer Doheny testified that he has observed the subject apartment 5 to 6 times over a period of approximately one year and saw approximately 20 people enter and exit the premises within a short period of time. He has observed known "runners” enter and leave the apartment.
The youth he arrested outside of apartment 17H with 10 glassine envelopes of heroin is the 15-year-old son of respondent Rodriguez.
The court rejects respondent tenants’ argument that the testimony of Officer Keating is inherently suspect because he could not have seen the windows on the 17th floor from where he was standing and in view of the darkness of the area. Officer Keating testified that the night in issue was clear and that he could clearly see the windows of apartment 17H from where he stood. The court finds his testimony credible.
Respondent tenants also assert that the large amount of heroin found in the grassy area outside the building came from the window of another apartment in the building. Respondent tenants urge that due to the large police activity conducted around the building that night a drug dealer in the building, fearful of apprehension, discarded incriminating evidence.
The only police activity on the night in issue was concentrated at apartment 17H. For a party or parties to discard heroin worth over $1 million there must be desperation and fear of an imminent arrest such as this case when the police were at the doorsteps of respondent tenants’ premises.
The court finds that based on the evidence in this case, the heroin found on the grounds outside the building came from the apartment in issue.
The court also finds respondent tenants’ argument that none of the tenants in the building testified against respondents to be unpersuasive. One of the reasons why the prosecutor’s office is bringing these eviction proceedings is that the tenants refuse to testify against known drug dealers because they are in fear of their safety and welfare.
Respondent tenants also argue that the police laboratory analysis reports should not have been admitted into evidence. Respondent tenants contend that since the laboratory reports were not admissible evidence, even if the court found that the white substance recovered from the grounds outside of the building came from apartment 17H, there was no proper proof to show that the white substance was heroin.
*1058 At trial, the court admitted the police laboratory ánalysis reports into evidence as the business record of the New York City Police Department under the business record rule pursuant to CPLR 4518 (a) and (c).
CPLR 4518 (c) provides in relevant part that, "[a]ll records, writings and other things referred to in sections 2306, 2307 * * * are admissible in evidence under this rule and are prima facie evidence of the facts contained, provided they bear a certification or authentication by the head of the hospital, laboratory, library, department or bureau of a municipal corporation or of the state, or by an employee delegated for that purpose or by a qualified physician.”
CPLR 2307 provides that the production of records and documents of a library, or a department or bureau of a municipal corporation or of the State, or an officer thereof, requires the issuance of a judicial subpoena duces tecum.
The police laboratory analysis report falls within the ambit of CPLR 2307.
CPLR 4518 (c) permits records and documents referred to in CPLR 2307 to be admitted into evidence as business records without the necessity of the offering party having to lay a foundation that they are business records, so long as they are properly certified or authenticated they are admissible. (Matter of Quinton A., 68 AD2d 394, revd on other grounds 49 NY2d 328; People v Brown, 128 Misc 2d 149; 5 Weinstein-Korn-Miller, NY Civ Prac ¶ 4518.26.)
CPLR 4518 (c) does not provide for any particular language of the attestation or certification but they must contain language to the effect that the copy offered is accurate and genuine as compared to the original. (People v Brown, supra; also see, 5 Weinstein-Korn-Miller, op. cit., ¶ 4540.05.)
Respondent tenants argue that the police laboratory reports were inadmissible on the grounds that (1) the certification did not set forth that the entry was made at the time of the events they record or within a reasonable time thereafter, and (2) that the certification did not set forth that the chemist who signed the certification is a qualified person to certify such report under CPLR 4518 (c).
Respondent tenants cite People v Mertz (68 NY2d 136) in support of their contention. In the Mertz case, the Court of Appeals found that it was error to admit into evidence breathalyzer logs which have not been shown that the entries were *1059 made at the time of the acts recorded or within a reasonable time thereafter pursuant to both CPLR 4518 (a) and (c).
The three police laboratory analysis reports in issue clearly set forth that the entries were made within a reasonable time of the acts recorded. One report was made on the same day of the test and the other two reports show that the reports were made within 1 to 2 days of the test. The laboratory reports meet the standards as set forth in the Mertz case (supra).
The certifications of the laboratory reports are signed by the chemist, J. Brandon. Although the certifications do not set forth that J. Brandon is a person qualified to certify such documents under CPLR 4518 (c), the certifications do state that the copies are true and full copy of the original reports which were prepared by J. Brandon. The certification of a laboratory report by the chemist who prepared the original report should be as reliable, if not more than a certification made by an individual qualified to certify such documents under CPLR 4518 (c). It appears that J. Brandon is a person delegated within the police laboratory to prepare and keep reports of this nature, and the court deems him to be such a person under CPLR 4518 (c).
Further, the chemist who performed the quantitative analysis of the substance testified as to his findings which were set forth in the police laboratory reports in issue.
The police laboratory reports were also admissible under CPLR 4518 (a).
CPLR 4518 (a) provides in relevant part that, "[a]ny writing or record * * * shall be admissible in evidence in proof of that act, transaction, occurrence or event, if the judge finds that it was made in the regular course of any business and that it was the regular course of such business to make it, at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter.”
Petitioner established a proper foundation for the admission of the police laboratory reports pursuant to CPLR 4518 (a) through the testimony of Officer Doheny and the chemist.
The rules governing the admission of business records were promulgated to assure the accuracy and trustworthiness of the information contained in the records. Petitioner has met its burden in establishing the accuracy and trustworthiness of the police laboratory reports as required under CPLR 4518 (a) and (c). (See, People v Farrell, 58 NY2d 637; People v Gower, 42 *1060 NY2d 117; People v Garneau, 120 AD2d 112; People v Mack, 86 Misc 2d 364.)
Based on the inordinate amount of evidence presented in this case against respondent tenants, the court finds that the apartment in issue was the nerve center and headquarters of a large narcotics operation, where narcotics were stored and sold. All of the respondent tenants were involved in this illegal operation and enjoyed the fruits of their illegal trade.
The illegal use of the subject premises by the respondent tenants constituted an illegal trade, business or manufacture pursuant to RPAPL 715 (1).
Accordingly, the court grants a final judgment of possession in favor of petitioner against respondents with the issuance and execution of the warrant forthwith.